Kane Moon (SBN 249834)
    kane.moon@moonyanglaw.com
H. Scott Leviant (SBN 200834)
    scott.leviant@moonyanglaw.com
**MOON & YANG, APC**
1055 W. Seventh St., Suite 1880
Los Angeles, California 90017
Telephone: (213) 232-3128
Facsimile: (213) 232-3125

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TONIKA NADINE CORA, individually, and on behalf of all others similarly situated,<br><br>        *Plaintiff*,<br><br>    vs.<br><br>WELLS FARGO BANK, N.A., a national association; WELLS FARGO & COMPANY, a Delaware Corporation; and DOES 1 through 10, inclusive,<br><br>        *Defendants*. | Case No. 5:19-cv-00109 TJH (SPx)<br><br>Assigned to: Hon. Terry J. Hatter, Jr.<br>Magistrate Judge: Hon. Sheri Pym<br><br><u>CLASS ACTION</u><br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND CERTIFICATION OF SETTLEMENT CLASS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:       April 18, 2022<br>Time:      10:00 a.m.<br>Courtroom: 9B<br>Judge:    Hon. Terry J. Hatter, Jr.<br><br>Action Filed:  December 3, 2018<br>Action removed:  January 18. 2019 |

TO THE COURT, TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on April 18, 2022, at 10:00 a.m., in Courtroom 9B of the above-entitled Court, located at First Street Courthouse, 350 W. First Street, Los Angeles, CA 90012, Plaintiff TONIKA NADINE CORA will and hereby does move the Court for an order granting final approval of the CLASS ACTION SETTLEMENT AGREEMENT AND RELEASE BETWEEN PLAINTIFF AND DEFENDANT ("Settlement" or "Agreement" herein) reached with Defendant Wells Fargo Bank, N.A. ("Defendant" or "Wells Fargo"), a true and correct copy of which is attached as Exhibit 1 to the Declaration of H. Scott Leviant previously submitted to the Court (Dkt. No. 42-1). Specifically, Plaintiff moves for an order to:

1.  grant approval of the terms of the Agreement as fair, reasonable and adequate under Rule 23(e) of the Federal Rules of Civil Procedure, including the amount of the settlement; the amount of distributions to class members; and the amounts allocated to the enhancement payments and attorney's fees and costs;

2.  certify for settlement purposes the Settlement Class and the FLSA Settlement Collective described in the Agreement;

3.  appoint Plaintiff as representative for the Settlement Class;

4.  appoint Moon & Yang, APC as counsel for the Settlement Class;

5.  approve the use of Rust Consulting as the settlement administrator;

6.  authorize distributions from the common fund; and,

7.  enter judgment on the terms specified in the Agreement and approved by the Court.

Plaintiff's motion is based on this Notice, the following Memorandum of Points and Authorities, the Declarations of H. Scott Leviant and Plaintiff submitted to the Court previously, the Declaration of Rust submitted herewith, all other pleadings and papers on file in this action, and any oral argument or other matter that may be considered by the Court.

The Parties previously agreed as part of the Settlement that motions for approval

1    were required, and the motion is not opposed.

2                              Respectfully submitted,

3    Dated:  March 10, 2022        **MOON & YANG, APC**

4

5                         By:
                                Kane Moon
6                                H. Scott Leviant

7                                Attorneys for Plaintiff

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

I.     INTRODUCTION.................................................................................................1

II.    THE NOTICE PROCESS WAS SUCCESSFULLY COMPLETED AFTER PRELIMINARY APPROVAL ...........................................................................1

III.   SUMMARY OF SETTLEMENT TERMS..........................................................2

IV.    BACKGROUND...................................................................................................7

V.     THE SETTLEMENT MERITS FINAL APPROVAL..........................................8

       A.    Plaintiff's Claims Merit Class Action Treatment for Settlement Purposes ................................................................................................10

             1.    Numerosity .................................................................................10

             2.    Commonality and Predominance of Common Issues ......................11

             3.    Typicality....................................................................................12

             4.    Adequate Representation..............................................................13

             5.    Superiority ..................................................................................13

       B.    The FLSA Settlement Collective Also Merits Certification....................15

       C.    The Settlement Falls Squarely Within the Range of Reasonableness and Should Be Finally Approved.............................................................16

             1.    The Value of the Settlement to Class Members Is Fair, Reasonable and Adequate ..............................................................17

             2.    The Agreed Upon Fees and Costs Are Reasonable.........................22

                   a)    Plaintiff seeks reasonable fees.................................................22

                   b)    Plaintiff seeks only actual costs.............................................23

             3.    The Service Payment Is Reasonable..............................................23

             4.    The Costs of Administration Are Reasonable .................................24

VI.    CONCLUSION .....................................................................................................25

1

TABLE OF AUTHORITIES

2

3  **FEDERAL DECISIONAL AUTHORITY**

4  *Acosta v. Trans Union LLC*, 243 F.R.D. 377 (C.D. Cal. 2007)...........................................9

5  *Armstrong v. Board of School Directors of the City of Milwaukee*,

6    616 F.2d 305 (6th Cir. 1980)...........................................................................................9

7  *Baldwin & Flynn v. Nat'l. Safety Associates*, 149 F.R.D. 598 (N.D. Cal. 1993) ............10

8  *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975)................................................. 10, 11, 12

9  *Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.*,

10    917 F.2d 1171 (9th cir. 1990).........................................................................................12

11  *Carter v. Anderson Merchandisers, LP*, No. EDCV 08-00025-VAPOPX, 2010 WL

12    144067 (C.D. Cal. Jan. 7, 2010).....................................................................................15

13  *Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*,

14    244 F.3d 1152 (9th Cir. 2001) .................................................................................. 11, 14

15  *D.A. Schulte, Inc. v. Gangi*, 328 U.S. 108 (1946)...............................................................15

16  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) ..........................................................10

17  *Elkins v. Equitable Life Ins. Of Iowa*, 1998 WL 133747 (M.D. Fla. 1998).....................14

18  *Hammon v. Barry*, 752 F.Supp 1087 (DDC 1990).............................................................17

19  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)...............................9, 11, 12, 13

20  *Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992)...........................................12

21  *In re Armored Car Anti-Trust Litigation*, 472 F.Supp 1357 (ND GA 1979)...................17

22  *In re Computer Memories Sec. Litig.*, 111 F.R.D. 675 (N.D. Cal. 1986) ........................10

23  *In re Immune Response Securities Litigation*,

24    497 F.Supp.2d 1166 (S.D. Cal. 2007)............................................................................17

25  *In re Southern Ohio Correctional Facility*, 175 F.R.D. 270 (S.D. Ohio 1997)...............23

26  *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685 (N.D. Ga. 2001)............................... 23, 24

27  *Jeree Gant v. ALDI, Inc. et al.*, No. LACV1903109JAKPLA,

28    2021 WL 4050936 (C.D. Cal. Aug. 25, 2021)..............................................................15

*Lewis v. Gross*, 663 F.Supp. 1164 (E.D.N.Y. 1986) ...........................................10

*Linney v. Cellular Alaska Partnership*, 1997 WL 450064 (N.D. Cal. 1997) ........... 17, 18

*Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350 (11th Cir. 1982)....................15

*Mars Steel Corp. v. Continental Illinois National Bank and Trust Co.*,

    834 F.2d 677 (7th Cir. 1987) ...........................................................................16

*Officers for Justice v. Civil Service Commission of City and County of San Francisco*,

    688 F.2d 615 (9th Cir. 1982)...........................................................................16

*Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268 (9th Cir. 1989) ........................23

*Pridd v. Edelman*, 883 F.2d 438 (6th Circuit 1989) ...........................................16

*Riordan v. Smith Barney*, 113 F.R.D. 60 (N.D. Ill. 1986)....................................10

*Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990) .........23

*Sommers v. Abraham Lincoln Federal Savings & Loan Association*,

    79 F.R.D. 571 (ED PA 1978) ..........................................................................17

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ........................................ 9, 16

*Strube v. American Equity Inv. Life Ins. Co.*, 226 F.R.D. 688 (M.D. Fla. 2005) ............14

*Thio v. Genji, LLC*, 14 F. Supp. 3d 1324 (N.D. Cal. 2014) ...............................15

*Valentino v. Carter-Wallace*, 97 F.3d 1227 (9th Cir. 1996) ...............................14

*Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943 (9th Cir. 1976) ............................8

*Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294 (N.D. Cal. 1995) .........................24

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002) ...............................23

*Wang v. Chinese Daily News*, 231 F.R.D. 602 (C.D. Cal. 2005) .............................. 10, 12

*Yue Zhou v. Wang's Rest.*, No. C 05-0279-PVT,

    2007 WL 2298046 (N.D. Cal. Aug. 8, 2007)....................................................15

*Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1188 (9th Cir. 2001)......................11


**CALIFORNIA DECISIONAL AUTHORITY**

*Duran v. US Bank Nat'l Ass'n*, 59 Cal. 4th 1 (2014).........................................18

**STATUTES**

29 U.S.C. § 216 .......................................................................................................15

Labor Code § 2699 .................................................................................................18

**RULES**

Fed. R. Civ. P. 23 ............................................................................................. passim

**TREATISES**

*Manual for Complex Litigation Second* § 30.44 (1985).........................................9

**OTHER AUTHORITIES**

*Findings of the Study of California Class Action Litigation*, 2000-2006........................21

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This is a putative wage and hour class action on behalf of non-exempt employees employed by Wells Fargo in California as Collector 3's and/or Operations Processor 2's in the Auto Loan division at any time from December 3, 2014, through September 1, 2021. The core issues in the case were based on allegations by named Plaintiff Tonika Nadine Cora ("Plaintiff") that Defendant did not provide legally compliant meal periods and rest breaks, did not compensate employees for all time worked, and, as a result, wage statements provided to employees were rendered inaccurate, final wages were not timely paid, and the conduct violated the California Private Attorneys General Act of 2004 ("PAGA") and the Unfair Competition Law ("UCL").  Defendant disputes these claims.

The case was thoroughly investigated by all Parties.  Plaintiff filed a motion for class certification, and, after that filing, the Parties agreed to attend mediation.  Following extensive written formal discovery, depositions of Plaintiff and putative class members, the exchange of additional data informally, and vigorous negotiation at mediation, Plaintiff and Defendant (Plaintiff and Defendant collectively referred to herein as the "Parties") reached a proposed class action settlement valued at $300,000 for 314 putative class members.  On November 4, 2021, this Court Preliminarily approved the Settlement (Dkt. No. 41), and the Notice process was then completed successfully.

The Parties believe the Settlement to be fair and reasonable, to adequately reflect the potential liability and substantial risks in this matter, and to be the result of thorough factual and legal analyses and arms-length negotiations.  Through this Motion, Plaintiff requests certification of a Settlement Class pursuant to Fed. R. Civ. P. 23 and final approval of the proposed class action settlement.

## II.    THE NOTICE PROCESS WAS SUCCESSFULLY COMPLETED AFTER PRELIMINARY APPROVAL

The Parties have fulfilled the class notice procedures set forth in the Court's Preliminary Approval Order and the Class Members' responses have been

overwhelmingly positive.  The claims administrator, Rust Consulting, Inc. ("Settlement Administrator" or "Rust"), sent individual notices to 538 Class Members on August 14, 2020.  (Declaration of Abigail Schwartz ("Schwartz Decl."), ¶ 7.)  The list of Class Members utilized by Rust was prepared by (1) obtaining a list of Class Members from Defendant, and (2) updating all addresses through the National Change of Address System.  (Schwartz Decl., ¶¶ 7-8.)  Rust mailed the Notice to 314 class members, based on the data described above.  (Schwartz Decl., ¶¶ 9.) Address traces were performed and updated addresses were obtained for 9 of the 13 returned packets.  (Schwartz Decl., ¶ 10.) Four Notices were undeliverable because current addresses could not be located even after using consumer databases to search for current addresses.  (Schwartz Decl., ¶ 10.)  The best Notice practicable was provided.

*No* Class Members have objected to the settlement.  (Schwartz Decl., ¶¶ 12, 14.) *No* Class Members submitted valid requests for exclusion.  (Schwartz Decl., ¶ 13.)  Rust's costs for administration will be $13,345.00.  (Schwartz Decl., ¶ 15.)  However, because Rust initially submitted a not-to-exceed bid of $9,975.00, Plaintiff requests, on Rust's behalf, that Rust receive an initial payment of $9,975.00 from the Gross Settlement Amount.  Then, if any checks remain uncashed, Plaintiff requests that Rust receive the remainder of its costs, $3,370.00, from funds that would otherwise be transmitted to the *cy pres*. (Schwartz Decl., ¶ 15.)  This approach will ensure that the information provided to the Class in the Notice is not rendered inaccurate (by changing the up-front payment to the Settlement Administrator), but it still gives Rust an opportunity to recoup its full costs.

## III.    SUMMARY OF SETTLEMENT TERMS

The full terms of the settlement are set forth in the Stipulation.  The primary material terms are as follows:

           (a)    The Settlement Class is:  those individuals who, according to Wells Fargo's personnel and payroll records, are or were employed by Wells Fargo in California as Collector 3's and/or Operations Processor 2's in

1          the Auto Loan division at any time from December 3, 2014, through

2          September 1, 2021 (this period shall be referred to as the "Class

3          Period"). (Settlement, ¶ 7.b.) Excluded from the Settlement Class are:

4          (1) any individual hired by Wells Fargo on or after December 11,

5          2015, when Wells Fargo implemented arbitration agreements

6          containing a class action waiver; and (2) any individual who signed a

7          severance agreement containing a general release. (Settlement, ¶

8          7.b.i.)

9     (b)   Defendant agrees not to oppose certification of a Class for purposes of

10          Settlement only (Settlement, ¶ 19);

11    (c)   <u>Settlement Amount</u>: Defendant will pay a maximum of **$300,000.00**,

12          referred to as the Gross Settlement Amount (or GSA herein), resulting

13          in an estimated average **gross** payment per Class Member of over

14          **$955.41** (Settlement, ¶ 10);

15    (d)   **Class Size**: Exactly **314** individuals are Settlement Class Members.

16          (Declaration of H. Scott Leviant ["Leviant Decl."], filed as Dkt. No.

17          41-1, at ¶ 35.)[1] There are approximately **20,617** work weeks worked

18          by the Settlement Class Members. The Settlement Class is a closed

19          class in that the covered positions are no longer employed by

20          Defendant in California.

21    (e)   <u>No Reversion</u>: The Settlement is a ***non-reversionary*** settlement

22          (Settlement, ¶¶ 10.a., 29);

23    (f)   <u>Certification</u>: Plaintiff addresses certification requisites herein, at Part

24          IV.A., and in the previously-filed Declaration of H. Scott Leviant.

25          Certification was addressed in greater detail at the time of preliminary

26

27    [1] The Declaration of H. Scott Leviant, submitted concurrently with the Motion for an
Award of Fees and Costs (Dkt. No. 42), entered as Docket number 42-1, will be referred
28    to hereinafter as the "Leviant Decl."

1    approval.

2    (g)    <u>No Claim Form</u>:  No claim form is required;

3    (h)    <u>Class Release</u>:  The Settlement will release specified wage-and-hour

4    claims for Participating Class Members (those Class Members who do

5    not timely opt out of the Settlement) (Settlement, ¶ 6.1);

6    (i)    <u>PAGA Release</u>:  The Class Members will release the PAGA Claims

7    set forth in this Action, that were identified in the Complaint and

8    Plaintiff's LWDA Notice Letter, regardless of whether they opt out of

9    the class portion of the Settlement (Settlement, ¶¶ 6.1, 6.3);

10   (j)    <u>Net Settlement Amount Available to the Class</u>: After deducting Class

11   Counsel's attorneys' fees and costs, service payment to Plaintiff,

12   estimated Administration costs, the FLSA Settlement Amount, and the

13   payment to the LWDA, the remainder will be available for distribution

14   to Class Members who do not opt out, with each Class Member

15   receiving a share based on the number of workweeks each Class

16   Member worked for Defendant in a relevant position within the Class

17   Period.  The Net Settlement Amount is estimated to be at least

18   $137,500 resulting in an average **net** payment per Class Member of at

19   least **$437.90**, before any tax withholdings. (Settlement, ¶ 10.)  In

20   addition, $25,000 will be distributed to the FLSA Settlement

21   Collective, which includes most of the Settlement Class Members.

22   (Settlement, ¶ 11.b.)

23   (k)    <u>Tax Allocation</u>: One-half (1/2) of all Settlement Share payments to

24   Participating Class Members shall be considered wages and shall be

25   subject to the withholding of all applicable local, state and federal

26   taxes, and one-half (1/2) of all Settlement Share payments to

27   Participating Class Members and 100% of FLSA Settlement Share

28   payments to Participating Collective Members shall be considered

non-wages for the settlement of interest claims, liquidated damages, and statutory and civil penalty claims. (Settlement, ¶ 13);

(l)    Employer's Portion of Payroll Taxes Paid Separately: Defendant's portion of payroll taxes (e.g., FICA, FUTA, etc.) owed on any settlement payments to Class Members that constitute wages will be paid separate and apart from the GSA (Settlement, ¶ 10.a);

(m)    Settlement Administrator:  The notice portion of the Settlement was administered by a third-party Administrator, Rust Consulting, and costs of administration were estimated to be less than $15,000. (Settlement, ¶ 10.b).  Rust incurred actual costs of $13,345.00 for administration.  (Schwartz Decl., ¶ 15.)  However, because Rust initially submitted a not-to-exceed bid of $9,975.00, payment to Rust is requested in two parts – an initial $9,975.00 payment from the GSA, and a contingent remainder to be deducted from any uncashed checks that would otherwise be directed to the *cy pres*.

(n)    Class Data for Administration:  The Administrator received the Class List within 21 calendar days of Preliminary Approval Date, used the NCOA database to update the Class List, and then used skip tracing on returned Notices (Settlement, ¶ 23);

(o)    Notice:  The Notice was distributed within 35 calendar days of the Preliminary Approval Date (Settlement, ¶ 28).  The Notice described how to dispute workweeks, submit an objection in writing, in person or through an attorney, or request exclusion (Settlement, ¶¶ 28-33 and Exhibit C thereto).

(p)    Objections:  Objections must be submitted in writing, by the response deadline, with the caveat that the Court may receive any objection, whether written or oral, at the Court's discretion (Settlement, ¶ 32);

(q)    Exclusion Requests:  The procedure for exclusion requests, mailing a

request to the Administrator, is the same as the procedure for

submitting a written objection (Settlement, ¶¶ 30 and 32);

(r)    PAGA Allocation: From the GSA, **$30,000** will be allocated to settle

claims brought pursuant to the California Private Attorneys General

Act, Labor Code § 2699 *et seq*. ("PAGA"). Seventy-five percent

(75%) of this amount, or **$22,500**, will be paid to the California Labor

& Workforce Development Agency. (Settlement, ¶ 15.)

(s)    Notice to LWDA:  Notice was provided prior to the filing of this

Motion.  Evidence is attached to the Leviant Declaration.

(t)    Enhancement/Service Awards to Plaintiff: Defendant will not oppose

the application for Class Representative Service Payment of up to

$5,000 for Plaintiff, to be paid from the GSA (Settlement, ¶ 14);

(u)    Fees and Costs:  Defendant will not oppose Class Counsel's

application for fees not to exceed 25% of the GSA (**$75,000.00**), and

actual costs, in an amount not to exceed **$20,000**, to be paid out of the

GSA; (Settlement, ¶ 16).

(v)    Uncashed Checks:  Any settlement checks that are mailed to the Class

Members and remain uncashed after 90 days of the date of issuance

will be cancelled, and the amounts of any voided settlement checks

shall be distributed to the California State Bar Justice Gap Fund (care

of The State Bar of California, 180 Howard St., San Francisco, CA

94105) (Settlement, ¶ 29);

(w)    Check Void Period:  Settlement checks will be valid for 90 days

(Settlement, ¶ 29);

(x)    Confidentiality Provisions:  The Settlement permits Class Counsel

to discuss the Settlement with Class Members (Settlement ¶ 56.

(Leviant Decl., ¶ 10.)  A true and correct copy of the CLASS ACTION SETTLEMENT

AGREEMENT AND RELEASE BETWEEN PLAINTIFF AND DEFENDANT is

1    attached thereto as Exhibit "1."

2

3    **IV.   BACKGROUND**

4           This Litigation was filed by Plaintiff on December 3, 2018, in the San Bernardino

5    County Superior Court. (Leviant Decl, at ¶ 4.) The action was removed to this Court on

6    January 18, 2019.  (*Id*.)

7           Having exhausted the administrative prerequisite for adding a PAGA claim, the

8    Parties stipulated to the filing of a First Amended Complaint ("FAC"), which stipulation

9    and proposed FAC should be filed on or before September 27, 2021, approximately

10   contemporaneous with this Motion filing. (Leviant Decl., at ¶ 5.) The FAC alleges that

11   Defendants Wells Fargo Bank, N.A. and Wells Fargo & Company: (1) failed to pay

12   minimum and straight time wages; (2) failed to pay overtime wages; (3) failed to provide

13   meal periods; (4) failed to authorize and permit rest periods; (5) failed to timely pay all

14   wages to terminated employees; (6) failed to furnish accurate itemized wage statements;

15   (7) violated California's Unfair Competition Law, California Business and Professions

16   Code section 17200 et seq.; (8) failed to pay employees for all hours worked, as required

17   by the Fair Labor Standards Act ("FLSA"); and, (9) violated provisions of the Labor Code

18   giving rise to civil penalty liability under the Labor Code Private Attorneys General Act of

19   2004 [Lab. Code § 2699, et seq.] ("PAGA"). (*Id*.)  Plaintiff has agreed to dismiss Wells

20   Fargo & Company as a defendant as a term of the Settlement based on Wells Fargo's

21   representation that Wells Fargo & Company (the parent company) did not employ Plaintiff

22   or any of the putative class members.  (*Id*.)

23          The Parties have conducted significant investigation of the facts and law during the

24   prosecution of this Litigation. (Leviant Decl., at ¶ 6.)  Such investigation has included

25   formal written discovery; the pre-mediation exchange of information; numerous

26   communications between the Parties; and the depositions of Plaintiff and several putative

27   class members. (*Id*.)  The Parties have further investigated the applicable law as applied to

28   the facts discovered regarding the alleged claims of Plaintiff and potential defenses thereto,

and the damages claimed by Plaintiff. (*Id*.)

On July 20, 2021, the Parties participated in a day-long mediation before Steve Rottman, a well-regarded mediator who has mediated many wage and hour class actions. (Leviant Decl., at ¶ 7.)  The matter did not settle at that mediation.  (*Id*.)  However, after the mediation, the Mediator and Parties continued to work towards a settlement. (*Id*.)  The Parties reached a settlement in the days following the July 20, 2021, mediation.  (*Id*.)

The Stipulation is intended to result in the creation of a settlement class comprised of all individuals employed by Wells Fargo in California as Collector 3's and/or Operations Processor 2's in the Auto Loan division at any time from December 3, 2014, through September 1, 2021.  (Leviant Decl., at ¶ 8.) There are 314 Settlement Class Members.  (*Id*.)

Solely for the purpose of settling this case, the parties stipulate and agree that the requirements for establishing class and collective action certification with respect to this class have been met and are met.  (Leviant Decl., at ¶ 9.)  If this Settlement is not approved by the Court for any reason, Defendant reserves its rights to contest class and/or collective action certification.  (*Id*.)  This Stipulation, if approved by the Court, will result in the termination with prejudice of the Litigation through the entry of the Judgment, and the release of all Released Claims for all Participating Class Members.  (*Id*.)  The Class Representative will also execute a general release of all possible claims. (*Id*.)  Settlement Collective Members who do not cash their FLSA Settlement check will not release their claims under the FLSA. (*Id*.)

## V.    THE SETTLEMENT MERITS FINAL APPROVAL

The law favors settlement, particularly in class actions and other complex cases, where substantial resources can be conserved by avoiding the time, cost, and the rigors of formal litigation.  *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976). These concerns apply in a case such as this, where allegedly wrongful practices potentially affected numerous employees, in relatively small amounts.

Any settlement of class litigation must be reviewed and approved by the court. This is done in two steps: (1) an early (preliminary) review by the court, and (2) a final review after notice has been distributed to the class for their comment or objections. The *Manual for Complex Litigation Second* states at § 30.44 (1985):

> A two-step process is followed when considering class settlements … if the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval, then the court should direct that notice be given to the class members of a formal fairness hearing, at which evidence may be presented in support of and in opposition to the settlement.

When parties reach a settlement agreement prior to class certification, "courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Acosta v. Trans Union LLC*, 243 F.R.D. 377, 383 (C.D. Cal. 2007).

"The first step is a preliminary, pre-notification hearing to determine whether the proposed settlement is 'within the range of possible approval.' This hearing is not a fairness hearing; its purpose, rather is to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing." *Armstrong v. Board of School Directors of the City of Milwaukee*, 616 F.2d 305, 314 (6th Cir. 1980) [quoting Manual for Complex Litigation s 1.46, at 53-55 (West 1977)]. "[T]he district court must assess whether a class exists," *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003), *i.e.*, whether the lawsuit qualifies as a class action under Rule 23. *See, e.g., Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (reviewing settlement to ensure compliance with requirements of Rule 23(a) and Rule 23(b)(3)).

At the second stage of the approval process, after class members have had an opportunity to object to the settlement, the court makes a final determination whether the settlement is "fair, reasonable and adequate" under Rule 23(e). *Armstrong*, 616 F.2d at

314; *see Staton*, 327 F.3d at 952; *see also* Rule 23(e)(C)(1), which provides that a court may finally approve a settlement of a class action if it finds after a hearing that the settlement is "fair, reasonable, and adequate" and Rule 23(e)(C)(4), which provides that any class member may object to a proposed settlement.

### A.   Plaintiff's Claims Merit Class Action Treatment for Settlement Purposes

In determining the propriety of class certification, a court may not delve into the underlying merits of the claims. The fundamental question "is not whether . . . plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974).

The Ninth Circuit has established that, when ruling on the propriety of class certification, a district court "is bound to take the substantive allegations of the complaint as true." *Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975). A court "may not require plaintiffs to make a preliminary proof of their claim; it requires only sufficient information to form a reasonable judgment." *Baldwin & Flynn v. Nat'l. Safety Associates*, 149 F.R.D. 598, 600 (N.D. Cal. 1993). Under these standards, this action meets the requirements for certification under Rule 23(a) and Rule 23(b)(3).

#### 1.   Numerosity

Under Rule 23(a)(1), a class action may be maintained where "the class is so numerous that joinder of all members is impracticable." In determining whether joinder would be impracticable, a court may consider not only the sheer number of class members, *Riordan v. Smith Barney*, 113 F.R.D. 60, 62 (N.D. Ill. 1986) (numbers alone may be dispositive), but also "the nature of the action, the size of the individual claims, [and] the inconvenience of trying individual suits." *Wang v. Chinese Daily News*, 231 F.R.D. 602, 606 (C.D. Cal. 2005). "A class action may proceed upon estimates as to the size of the proposed class." *Lewis v. Gross*, 663 F. Supp. 1164, 1169 (E.D.N.Y. 1986). *See also, In re Computer Memories Sec. Litig.*, 111 F.R.D. 675, 679 (N.D. Cal. 1986) (class certified where plaintiffs did not establish exact size, but demonstrated that class would "obviously

be sufficiently numerous").

In this action, the Class is composed of 314 individuals.  (Leviant Decl., ¶ 35; Schwartz Decl., ¶ 7.)  It is sufficiently numerous that the individual joinder of all members is impracticable.

## 2.   Commonality and Predominance of Common Issues

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." This commonality requirement is "construed permissively." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).  Plaintiff need not demonstrate that all questions of fact and law are common.  "The existence of shared legal issues with divergent factual predicates is sufficient." *Id*.  Where a class is united by a common interest in determining whether a defendant's broad course of conduct is actionable, commonality is not defeated "by slight differences in class members' positions." *Blackie,* 524 F.2d at 901 n.17.

In this litigation, all Class Members have shared a common interest in determining: whether Defendant provided legally compliant meal periods and rest breaks to Class Members; whether Defendant paid employees for all time worked; whether Defendant violated the itemized wage statement provisions of Labor Code § 226 by not providing accurate information as to wages; and whether Defendant's policies and practices violated California Business & Professions Code §§ 17200 *et seq*., PAGA, and the FLSA.

Given the permissive standard that courts in the Ninth Circuit employ when determining commonality, certification of the Class for settlement purposes is appropriate as Rule 23(a)(2) is satisfied.

Once it is established that common issues of law or fact exist, for Rule 23(b)(3) purposes, the Court next examines whether those common issues predominate. The predominance inquiry focuses on whether the class is "sufficiently cohesive to warrant adjudication by representation." *Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001).  Central to predominance is "the notion that the adjudication of common issues will help achieve judicial economy." *Zinser v. Accufix Research Institute, Inc*., 253 F.3d 1188, 1189 (9th Cir. 2001).  When common questions

represent a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022. It is well settled that the need for determining differing amounts of damages suffered by different class members does not preclude class certification. *See*, *Blackie*, 524 F.2d at 905; *Wang*, 231 F.R.D. at 613.

There are common issues that may predominate over individual issues in this litigation. For example: (1) whether Defendant uniformly failed to provide Class Members with legally compliant meal periods and rest breaks; (2) whether Defendant required or permitted employees to work off the clock; (3) whether Defendant provided putative Class Members with itemized wage statements that were inaccurate in violation of Labor Code § 226; and (4) whether Defendant failed to pay all overtime wages due and payable to former employees within the times specified under the California Labor Code.

### 3.    Typicality

Rule 23(a)(3) requires that the representative plaintiff have claims "typical of the claims . . . of the class." This factor is also construed permissively. *See Hanlon*, 150 F.3d at 1019-20. Representative claims are typical "if they are reasonably co-extensive with those of absent class members; they need not be identical." *Id*. at 1020. In other words, named plaintiffs need not be "identically situated" with all other class members. "It is enough if their situations share a common issue of law or fact and are sufficiently parallel to insure a vigorous and full presentation of all claims for relief." *Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.*, 917 F.2d 1171, 1175 (9th Cir. 1990).

Typicality refers to the "nature of the claim . . . of the class representative, and not to the specific facts from which it arose." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). The typicality requirement is satisfied where "the named Plaintiffs raise the same Labor Code violations as other putative class members." *Id*. Here, Plaintiff is raising the same claims as the putative class members and has alleged no other individual claims in this matter. (Leviant Decl., ¶ 36; Declaration of Cora ["Cora Decl."],

1    attached as Exhibit 3 to the Leviant Decl. and previously filed as Dkt. No. 35-2, ¶¶ 10-

2    12.)[2]

3              **4.    Adequate Representation**

4              Rule 23(a)(4) requires that "the representative parties will fairly and adequately

5    protect the interests of the class."  Adequate representation turns on whether the named

6    plaintiff and his counsel "have any conflicts of interest with other class members," and

7    whether the named plaintiff and his counsel will "prosecute the action vigorously on behalf

8    of the class."  Adequacy may be established by the mere fact that counsel are experienced

9    practitioners.  *Hanlon*, 150 F.3d at 1020.

10             There are no conflicts of interest between Plaintiff and Class Members, and Plaintiff

11   has both shown and expressed her willingness to represent Class Members.  (Cora Decl., ¶

12   6-12.)  The similarity of the claims asserted and remedies sought by Class Members and

13   Plaintiff do not suggest any divergent interests held by Plaintiff.  Defendant did not assert

14   unique defenses against Plaintiff that it could not assert against any other Class Member.

15   Also, there are no conflicts with Plaintiff's counsel.

16             Plaintiff's counsel has substantial class action experience and can adequately

17   represent the Class.  They have been appointed class counsel in many wage and hour class

18   actions against major employers.  (Leviant Decl., ¶¶ 20-25.)

19             **5.    Superiority**

20             In deciding whether to certify a class for settlement purposes, a court considers the

21   following factors to determine whether a class action is superior: (a) class members'

22   interests in individually controlling the prosecution or defense of separate actions; (b) the

23   extent and nature of any litigation concerning the controversy already commenced by or

24   against members of the class; and (c) the desirability or undesirability of concentrating the

25

26

27       [2] The Declaration of Tonika Nadine Cora, attached as Exhibit 3 to the Leviant Decl.,
was submitted concurrently with the Motion for Preliminary Approval (Dkt. No. 35) and
28   entered as Docket number 35-2. It will be referred to hereinafter as the "Cora Decl."

litigation of the claims in the particular forum.[3]  Some courts have found that the third

Rule 23(b)(3) factor is "conceptually irrelevant in the context of a settlement."  See *Strube*

*v. American Equity Inv. Life Ins. Co.*, 226 F.R.D. 688, 697 (M.D. Fla. 2005).  "With the

settlement in hand, the desirability of concentrating the litigation in one forum is obvious."

*Elkins v. Equitable Life Ins. Of Iowa*, 1998 WL 133747, at *19 (M.D. Fla. 1998).

To determine whether the superiority requirements of Rule 23(b)(3) are satisfied, a

court compares a class action with alternative methods for adjudicating the parties' claims.

Lack of a viable alternative to a class action necessarily means that it satisfies the

superiority requirement.  *See Valentino v. Carter-Wallace*, 97 F.3d 1227, 1235-36 (9th Cir.

1996) ("a class action is a superior method for managing litigation if no realistic alternative

exists").  "[I]f a comparable evaluation of other procedures reveals no other realistic

possibilities, [the] superiority portion of Rule 23(b)(3) has been satisfied."

*Culinary/Bartender Trust Fund*, 244 F.3d at 1163.  In *Culinary/ Bartender Trust Fund*, the

Ninth Circuit held that the "case involve[d] multiple claims for relatively small sums" and

that the class action clearly served as the only method that would "'permit the plaintiffs to

pool claims which would be uneconomical to litigate individually.'"  *Id*. at 1163.

The class action is superior here as it is on the only method that will allow Class

Members "to pool [their individual] claims which would be uneconomical to litigate

individually." *Id.*

The factors articulated in Rule 23(b)(3)(A), (B) and (C) also favor class

certification.  It is difficult to believe that any Class Members have an interest in

individually controlling the prosecution of separate actions, given the relatively small sums

involved for any one Class Member.  Any Class Member who wants to pursue a separate

action can opt out of the Settlement.

---

[3] Rule 23(b)(3)(A)-(C). When a court reviews a class action settlement, it does *not* consider Rule 23(b)(3)(D), the fourth factor, regarding difficulties of managing a class action. *Amchem Products Inc. v. Woodward* (1997) 521 U.S. 591, 620 (in deciding whether to certify a class for settlement purposes, a district court "need not inquire whether the case, if tried, would present intractable management problems").

Also, it is desirable to concentrate the issues in this forum. The Settlement allows all individuals to resolve similar claims against Defendant through a process that does not even require the submission of a claim form.

### B.    The FLSA Settlement Collective Also Merits Certification

Because the allegation of unpaid wages for off-the-clock work states a claim both under the California Labor Code and the FLSA, the Parties agreed to explicitly assert the FLSA claim for relief in the FAC in order to provide a full release of the primary right asserted (the right to be paid wages for all hours worked).

The settlement of collective actions under the FLSA is addressed by 29 U.S.C. § 216. *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1354 (11th Cir. 1982). The issue presented under the FLSA is whether the settlement of collective-action claims "is a fair and reasonable resolution of a *bona fide* dispute." *Thio v. Genji, LLC*, 14 F. Supp. 3d 1324, 1333 (N.D. Cal. 2014) (quoting *Yue Zhou v. Wang's Rest*., No. C 05-0279-PVT, 2007 WL 2298046, at *1 (N.D. Cal. Aug. 8, 2007)). That test is similar to the one that applies under Fed. R. Civ. P. 23(e); both focus on fairness and reasonableness. "However, the FLSA adds an additional requirement: the dispute must be *bona fide, i.e.*, there must be some uncertainty about the extent of liability." *Jeree Gant v. ALDI, Inc. et al.,* No. LACV1903109JAKPLA, 2021 WL 4050936, at *6 (C.D. Cal. Aug. 25, 2021), citing *D.A. Schulte, Inc. v. Gangi*, 328 U.S. 108, 113-16 (1946). Other than the *bona fide* dispute element, where parties include the settlement of a FLSA collective action as part of a class action settlement, it is appropriate for the court to incorporate analysis of the FLSA collective action claim settlement in its consideration of the class action settlement. *Carter v. Anderson Merchandisers, LP*, No. EDCV 08-00025-VAPOPX, 2010 WL 144067, at *3 (C.D. Cal. Jan. 7, 2010).

Here, a *bona fide* dispute as to the extent of liability most certainly exists. By its nature, an off-the-clock claim often, as here, is difficult to quantify with precision. In this case, the issue is fraught with more uncertainty: the collective action members manually entered their hours worked themselves and confirmed them as accurate each week,

presenting Defendant with a powerful argument that it is all but impossible to determine which employees entered their actual hours worked and which, if any, entered time that they claim was expected by the employer but less than the true hours worked.

**C.     <u>The Settlement Falls Squarely Within the Range of Reasonableness and Should Be Finally Approved</u>**

No single criterion determines whether a class action settlement meets the requirements of Rule 23(e). The Ninth Circuit has directed district courts to consider a variety of factors without providing an "exhaustive list" or suggesting which factors are most important. *See, Staton*, 327 F.3d at 959. "The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Officers for Justice v. Civil Service Commission of City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).

Due to the impossibility of predicting any litigation result with certainty, a district court's evaluation of a settlement essentially amounts to "'an amalgam of delicate balancing, gross approximations and rough justice.'" *Id*. at 625. The ultimate touchstone, however, is whether "class counsel adequately pursued the interests of the class as a whole." *Staton*, 327 F.3d at 961.

As the Ninth Circuit explained in *Officers for Justice*, the district court's role in evaluating a class action settlement is therefore tailored to meet that narrow objective. *Officers for Justice*, 688 F.2d at 625. Review under Rule 23(e) "must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties." *Id*. Accordingly, the Ninth Circuit will not reverse a district court's approval of a class action settlement "unless the fees and relief provisions clearly suggest the possibility that class interests gave way to self interest." *Staton*, 327 F.3d at 961.

There is a presumption that the negotiations were conducted in good faith. Newberg, §11.51; *Pridd v. Edelman*, 883 F.2d 438, 447 (6th Circuit 1989); *Mars Steel*

*Corp. v. Continental Illinois National Bank and Trust Co.*, 834 F.2d 677, 682 (7th Cir. 1987).  Courts do not substitute their judgment for that of the proponents, particularly where, as here, settlement has been reached with the participation of experienced counsel familiar with the litigation.  *Hammon v. Barry*, 752 F. Supp. 1087 (D.D.C. 1990); *In re Armored Car Anti-Trust Litigation*, 472 F. Supp. 1357 (N.D. GA 1979); *Sommers v. Abraham Lincoln Federal Savings & Loan Association*, 79 F.R.D. 571 (E.D. PA 1978).  The fact that settlement results from arms-length negotiations following "relevant discovery" creates "a presumption that the agreement is fair." *Linney v. Cellular Alaska Partnership*, 1997 WL 450064, *5 (N.D. Cal. 1997); *See In re Immune Response Securities Litigation*, 497 F. Supp. 2d 1166, 1174 (S.D. Cal. 2007) (settlement approved where informal discovery gave the parties a clear view of the strength and weaknesses of their cases).

Here, the Parties reached a non-collusive settlement after discovery and extended negotiations.  The settlement was finally reached after a day of arm's length negotiations before Steve Rottman, a highly-respected mediator skilled at helping parties attempting to negotiate reasonable settlements in wage and hour class actions.  Obtaining class certification and establishing liability posed significant hurdles for the class that justified the settlement.  The Stipulation falls well within the range of reasonable outcomes and merits approval under Rule 23(e).  (Leviant Decl., ¶¶ 7-8, 10, 12-19.)

### 1.     The Value of the Settlement to Class Members Is Fair, Reasonable and Adequate

The Parties reached a Settlement in good faith after negotiating at arm's length with a professional mediator.  (Leviant Decl., ¶ 7.)  Settlement occurred only after discovery commenced and additional information was shared prior to mediation (including detailed time records for a sample of putative class members).  The information produced in discovery, and the additional data about class composition produced for mediation, were sufficient to permit Plaintiff's counsel to adequately evaluate the settlement. And, notably, approval of a class action settlement does not require that discovery be exhaustive.  *See*,

*e.g.*, *In re Immune Response Securities Litigation*, 497 F. Supp. 2d 1166, 1174 (S.D. Cal. 2007) (settlement approved where informal discovery gave the parties a clear view of the strength and weaknesses of their cases).  The fact that settlement results from arms length negotiations following "relevant discovery" creates "a presumption that the agreement is fair."  *Linney v. Cellular Alaska Partnership*, 1997 WL 450064, at *5 (N.D. Cal. 1997).

        With respect to the claims asserted on behalf of the Settlement Class in this case, there are significant risks that support the reduced compromise amount. These risks include, but are not limited to: (i) the risk that Plaintiff would be unable to establish liability for allegedly unpaid straight time or overtime wages, *see Duran v. US Bank Nat'l Ass'n*, 59 Cal. 4th 1, 39 & fn. 33 (2014) ("*Duran*"), *citing Dilts v. Penske Logistics, LLC* 2014 WL 205039 (S.D. Cal. 2014) (dismissing certified off-the-clock claims based on proof at trial); (ii) the risk that Defendant's challenged employment policies might not ultimately support class certification or a class-wide liability finding, *see*, *Duran*, 59 Cal. 4th at 14 & fn. 28 (citing Court of Appeal decisions favorable on class certification issue without expressing opinion as to ultimate viability of proposition); (iii) the risk that uncertainties pertaining to the ultimate legality of Defendant's policies and practices could preclude class-wide awards of statutory penalties under Labor Code §§ 203 and 226(e); (iv) the risk that individual differences between Settlement Class Members could be construed as pertaining to liability, and not solely to damages, *see*, *Duran*, 59 Cal. 4th at 19; (v) the risk that any civil penalties award under the PAGA could be reduced substantially by the Court in its discretion, see Labor Code § 2699(e)(1); (vi) the risk that class treatment could be deemed improper as to one or more claims except for settlement purposes; (vii) the risk that lengthy appellate litigation could ensue, (viii) <u>the substantial risk that the manual time entry system utilized by Defendant would make both certification and proof of liability prohibitively unlikely</u>, and (ix) <u>the substantial risk that a large number of declarations collected by Defendant would overwhelm the modest number of declarations collected by Plaintiff and translate into evidence sufficient to preclude class certification</u>.  Defendant strongly denies any liability and the propriety of class certification

for any reason other than settlement.  (Leviant Decl., ¶¶ 15.)  Continued litigation of this lawsuit presented Plaintiff and Defendant with substantial legal risks that were (and continue to be) very difficult to assess.

In light of the uncertainties of protracted litigation, the settlement amount reflects a fair and reasonable recovery for the Settlement Class Members.  (Leviant Decl. ¶¶ 12-19.)  The settlement amount is, of course, a compromise figure.  (Leviant Decl. ¶ 16.)  By necessity it took into account risks related to liability, damages, and all the defenses asserted by the Defendant.  (*Id*.)  Moreover, each Settlement Class Member will be given the opportunity to opt out of the Settlement, allowing those who feel they have claims that are greater than the benefits they can receive under this Settlement, to pursue their own claims. (*Id*.)  For the 314 members of the Class, the average *gross* recovery before deductions for taxes, fees, and other costs, is approximately **$955.41** per class member. (Leviant Decl., ¶ 16.)  The value of this amount reflects a fair compromise well within the range of reasonableness.  Given the strong case that Defendant could bring to bear to challenge certification and liability, this is not an inconsequential sum.  And, confirming the fundamental fairness of the settlement, <u>each Class Member</u> will be compensated ratably based on the number of weeks they that they worked in a relevant position during the class period (the Class members worked full time schedules, rendering allocation by work week equitable). (*Id*.)

The Gross Settlement Amount of <u>**$300,000**</u> is about **129%** of the **$232,147.23** estimate of *risk-adjusted* recovery (excluding interest) at *this* stage in the litigation. While Plaintiff would certainly have preferred to recover more (and Defendant would have preferred to pay less), this outcome is in line with a carefully constructed estimate of the current fair value of the case.  (Leviant Decl., ¶ 17.)  On that basis, it would be unwise to pass up this settlement opportunity.  The maximum damage values are estimates based on average wage rates, numbers of employees, and the amount of time covered by the class period.  (*Id*.)

After analyzing the claims in this matter, Plaintiff has concluded that the value of

this Settlement is fair, adequate and reasonable. The maximum calculated reasonable exposure, after removing implausible or extreme estimated recoveries, is **$2,411,927.83**, *including* PAGA penalties. Based on each claim, the estimated exposure for off the clock work over the class period, assuming 100% of that time was overtime, was calculated to be **$115,970.00** (assuming 5 minutes of off-the-clock work each shift due to calls extending past scheduled shift end times). With risk factor discounts for certification (estimated at 0.25) and liability proof (estimated at 0.3), the current value of that claim is estimated by Plaintiff's counsel to be only **$8,697.75**. The reasonably estimated exposure for rest break violations over the class period was calculated at **$371,106.00**, but with low chances of certification and proof of liability (20% and 20% respectively) for a risk-adjusted exposure of **$14,844.24** (based on an estimate of one rest period violation for *every* Class Member in **100%** of their work weeks). The reasonably estimated exposure for meal break violations over the class period was calculated at **$371,106.00** before any risk reductions, but with low chances of certification and proof of liability (25% and 30% respectively) for a risk-adjusted exposure of $27,832.95 (based on an estimate of one meal period violation for *every* Class Member in **100%** of their work weeks). Risk-adjusted penalty recoveries for wage statement and Labor Code § 203 penalties were estimated to be approximately **$8,765.63** and **$34,560.00**, respectively, on maximum exposures of **$175,312.50** and **$691,200.00**, respectively (not only are the Section 203 and 226 penalties entirely dependent on the success of the off-the-clock claim, they both must also overcome the defense that Defendant did not intend any underpayment, based on self-reported time; additionally, the 226 penalty has a one-year statute, and Defendant was well along in moving these jobs out of California by that time). The FLSA claim is duplicative of the off-the-clock claim in that it seeks recovery of the same unpaid wages, but at the lower overtime rate applied by the FLSA. Performing risk-adjusted valuations for all claims yields a total value in the range of only **$94,700.57**, excluding PAGA.[4] (*Id.*) PAGA

---

[4] In a sense, it is nonsensical to assign specific percentages to future events, but it does provide a specific method for attempting to reduce the concept of "very high risk" or

penalties were calculated as having a maximum realistic exposure of **$687,233.33** (because much of the Class was no longer employed in California during the statutory period), but a risk adjusted value of **$137,446.67**, after factoring in risks of reduction in penalties pursuant to Court discretion and the high risk of the inability to prove violations for all aggrieved employees.[5]  (Leviant Decl., ¶ 17.)

This result here is fully supportable as reasonable.  First, rest break and meal period claims have been challenging to certify for many years, even after *Brinker*.[6]  (Leviant Decl., ¶ 18.)  Second, off-the-clock claims have proven to be extremely difficult to certify by their very nature.  In this case, the difficulty of certifying and proving off-the-clock and meal period claims is compounded by the practice of having employees enter their own times manually in a timekeeping system which they confirm as accurate each week.  Third, certification rates are lower than conventional wisdom holds.  *See*, *e.g.*, H. Scott Leviant, *Second Interim Report on class actions in California sheds new light on certification* (February 19, 2010), www.thecomplexlitigator.com, available at http://www.thecomplexlitigator.com/post-data/2010/2/19/second-interim-report-on-class-actions-in-california-sheds-n.html; *see also*, *Findings of the Study of California Class Action Litigation*, 2000-2006, available at http://www.courtinfo.ca.gov/reference/documents/class-action-lit-study.pdf (finding, as part of a study conducted by the Judicial Council of California, at page 5, and in Table 9, at page 15, that only 21.4% of all class actions were certified either as part of a settlement

---

[5] "high risk" to a quantifiable amount.  Certification of a claim is typically a binary event.  One does not obtain a 20% certification; a claim is either certified or it is not.  But the current expected value is best quantified by applying a risk reduction, based on the total experience of counsel.

[5] As noted above, the *substantial* risk represented by the timekeeping practice where class members manually entered their own time makes both certification and liability proof in this matter *exceedingly* risky and greatly increases the risk of a PAGA penalty reduction.

[6] Furthermore, here, Defendant's meal and rest period policies are facially lawful, Defendant has a method to pay premiums, and there is a record of premium payments made, including to Plaintiff.  (Leviant Decl., ¶ 17.)

*or* as part of a contested certification motion).  In estimating risk adjustments here, Plaintiff's counsel has assumed estimated certification probabilities of 20% - 25%, depending on the claim, assumptions that equal or substantially *exceed* the average rate at which cases were certified in California over the study years, based upon data available through the California Courts website.  (*Id*.)  And those certification risk estimates are likely high, given the factual challenges present in all off-the-clock work cases and this case in particular.  Given that well under 20% of all cases filed in California as proposed class actions are ultimately certified by way of a contested motion, and a similar trend is seen in federal courts, it is fair to say that, if anything, the use of high estimates for certification *overstates* the realistic current claim value.  (*Id*.)  It would also be appropriate to evaluate the result by examining only the premium wages at issue, excluding penalties and interest.[7]  Under that metric, the settlement recovered an amount approximately equal to 40% of the realistic claim value for the premium wages at issue (wages, and meal and rest period premiums). Viewed either way, this Settlement achieves the goals of the litigation.

By obtaining reasonable value for their claims in light of the substantial risks of litigation, Plaintiff clearly achieved a fair settlement that merits approval, particularly in light of the risks posed by further litigation.

### 2.    The Agreed Upon Fees and Costs Are Reasonable

#### a)    *Plaintiff seeks reasonable fees.*

While a separate Motion addresses Plaintiff's requests for attorney's fees, costs, and an enhancement award, Plaintiff briefly addresses the reasonableness of the amounts

---

[7] The exclusion of interest and penalties from the fairness evaluation is proper because, first, PAGA penalties are discretionary (*see* Lab. Code § 2699(e)(2) (the court in its discretion "may award a lesser amount than the maximum civil penalty amount specified by this part…")), and, second, courts evaluate the strength of a proposed settlement without taking potential penalties or interest into consideration.  *See Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 955 (9th Cir. 2000); *see also Miller v. CEVA Logistics U.S.A., Inc.*, 2015 WL 729638, at *7 (E.D. Cal. Feb. 19, 2015) (court utilized calculation of a defendant's exposure exclusive of interest and penalties to determine whether the settlement fell within the range of possible approval).

below.

The compensation sought for Plaintiff's counsel is also fair and reasonable. The Ninth Circuit has directed that, to determine what constitutes a fair and reasonable percentage of the settlement for purposes of calculating common fund attorneys' fees, the courts should begin with a "benchmark" percentage of the total fund. *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002); *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990). The percentage can be adjusted upwards where the risks overcome, the benefits obtained and the work necessary to achieve those results supports such an adjustment of the benchmark.

Here, the Settlement Amount is $300,000. Plaintiff's counsel has agreed to seek no more than **$75,000.00** in fees, which is appropriate in light of the quality of the result and the benchmark standard, and is well under the current lodestar of no less than $136,986.00.[8]  (Leviant Decl., ¶ 31.)

> b)    *Plaintiff seeks only actual costs.*

Plaintiff's counsel also requests actual costs incurred and paid without reimbursement in the litigation of this Action, not to exceed $20,000. Those costs are **$17,857.97**, as supported by the Declaration of H. Scott Leviant attaching a summary of incurred costs as Exhibit "4".  (Leviant Decl., ¶¶ 44, 47 and Exhibit 4.)

### 3.    The Service Payment Is Reasonable

Service payment awards serve to reward the named plaintiff for the time and effort expended on behalf of the class, and for exposing herself to the significant risks of litigation. "Courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001); *In re*

---

[8] While Plaintiff's Counsel has frequently obtained fee awards in excess of the presumptive benchmark, Plaintiff's Counsel will seek no more than 25% of the GSA.

*Southern Ohio Correctional Facility*, 175 F.R.D. 270, 272 (S.D. Ohio 1997). In *Coca-Cola*, for example, the court approved incentive awards of $300,000 to each named plaintiff in recognition of the services they provided to the class by responding to discovery, participating in the mediation process and taking the risk of stepping forward on behalf of the class. *Coca-Cola*, 200 F.R.D. at 694; *see also Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 300 (N.D. Cal. 1995) (approving $50,000 participation award).

Here, Plaintiff's counsel requests that the Court grant Plaintiff a service award of $5,000. The amount of the service award is reasonable given the risks undertaken by Plaintiff. Taking the risk of filing a lawsuit against an employer deserves reward. Additionally, Plaintiff was actively involved in the litigation and settlement negotiations of this Action. And Plaintiff worked diligently with counsel to prepare the action and conferred with counsel regarding settlement negotiations. (Cora Decl., ¶ 6-22; Leviant Decl., ¶ 32.) The requested amount is reasonable. Plaintiff also participated in discovery, sitting for a full day deposition in this matter. Plaintiff will also provide a general release as a condition of the enhancement, which further supports its reasonableness.

### 4.    The Costs of Administration Are Reasonable

Rust Consulting, Inc., an experienced third-party administrator, was appointed to administer the notice and settlement distributions in this matter. (Schwartz Decl., ¶ 3.) Performing in all respects as required by the Agreement to date, the final cost of administration, including future work, is $13,345.00. (Schwartz Decl.,¶ 15.) Administration of this Settlement for 314 Class Members occurred without any issues to date. (Leviant Decl., ¶ 33.) Rust will continue to perform services for the Settlement Class Members when it completes the calculation and distribution of payments made under the Settlement. Because Rust initially agreed to provide a not-to-exceed bid, based on conditions known at the time, Rust's initial bid for work was $9,975.00. (Schwartz Decl., ¶ 15.) However, because Rust encountered unexpected difficulties with the data set it was provided (Schwartz Decl., ¶ 15), Plaintiff requests, on Rust's behalf, that Rust receive an initial payment of $9,975.00 from the Gross Settlement Amount. Then, if any

checks remain uncashed, Plaintiff requests that Rust receive the remainder of its costs, $3,370.00, from funds that would otherwise be transmitted to the *cy pres*. (Schwartz Decl., ¶ 15.) This approach will ensure that the information provided to the Class in the Notice is not rendered inaccurate (by changing the up-front payment to the Settlement Administrator), but it still gives Rust an opportunity to recoup its full costs.

## VI. CONCLUSION

Plaintiff negotiated a settlement that resolves claims and recovers money for 314 Settlement Class Members. This settlement is fair and reasonable, especially given the claims and the potential defenses to them and to class certification. Plaintiff asks the Court to grant final approval of the settlement and adopt the proposed order submitted herewith.

Respectfully submitted,

Dated: March 10, 2021

**MOON & YANG, APC**

By: ______________________________

Kane Moon
H. Scott Leviant

Attorneys for Plaintiff